HARTMAN & HARTMAN
   Jeffrey L. Hartman, NV Bar 1607
   notices@bankruptcyreno.com
510 West Plumb, Ste. B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818

AFFELD GRIVAKES ZUCKER LLP
   David Affeld, CA Bar 123922
   dwa@agzlaw.com
   Christopher Grivakes, NV Bar 7725
   cg@agzw.com
   Gregg Zucker, CA Bar 166692
   gz@agzaw.com
12400 Wilshire Blvd., Ste 1180
Los Angeles, CA 90025
T: (310) 979-8700
F. (310) 979-8701

Attorneys for plaintiff, JOHN BRYAN, TRUSTEE,
THE LITIGATION TRUST OF ASTRATA GROUP, INC.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re:  ASTRATA GROUP INC.,<br><br>        Debtor, | BK- 09-52652-GWZ<br>CHAPTER 11 |
| JOHN BRYAN, TRUSTEE,  THE LITIGATION TRUST OF ASTRATA GROUP, INC., | ADVERSARY NO: |
|         Plaintiff,<br>vs.<br><br>VISION OPPORTUNITY CHINA LP, a Guernsey limited partnership, VISION OPPORTUNITY CHINA FUND LIMITED, | COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF for:<br>1.   INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS<br>2.   INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE |

a Guernsey corporation, VISION
OPPORTUNITY MASTER FUND, LTD.,
a Cayman Islands company, VISION
CAPITAL ADVANTAGE FUND, L.P., a
Delaware limited partnership, VCAF GP,
LLC, a Delaware limited liability company,
VISION CAPITAL ADVISORS, LLC, a
Delaware limited liability company,
TRIDEX TECHNOLOGIES PTE. LTD., a
Singapore entity, TRIDEX PTE. LTD., a
Singapore entity, QT TECHNOLOGIES, a
Hong Kong entity, JOHN CLOUGH, an
individual, JED FROST, an individual,
ROBIN LITTAU, an individual, and DOES
1 through 20, inclusive,

    Defendants.

3.    BREACH OF FIDUCIARY DUTY
4.    BREACH OF FIDUCIARY DUTY
5.    BREACH OF FIDUCIARY DUTY
6.    BREACH OF FIDUCIARY DUTY
7.    TRESPASS TO CHATTELS
8.    MISAPPROPRIATION OF TRADE
       SECRETS

DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1.    This case arises out of a scheme by a company's director, shareholders, and others to intentionally interfere with a company's pre-petition restructuring plan (by unlawfully asserting majority ownership and attempting to reconstitute the board of directors) in order to negotiate preferential treatment for themselves at the expense of the company. As part of their scheme, when the interference did not achieve their intended goals, they stole assets and trade secrets from the company. That company was Astrata Group, a Nevada corporation ("Astrata" or "Debtor").

2.    In August 2009, Astrata filed its voluntary petition for relief under Title 11 of the United States Code in the United States Bankruptcy Court for the District of Nevada, Case No. 09-52652-GWZ (the "Main Case"). The Main Case remains pending in that Court. The present action is a civil proceeding arising out of and related to the Main Case. The present action is a "core" proceeding under 28 U.S.C. §§ 157(b)(2)(A), (C) and (O). This court has jurisdiction over this matter under Sections 157 and 1334 of Title 28 of the United States Code. To the extent applicable, Plaintiff consents to entry of final judgment by the Court on any non-core claims.

3.     As is more fully set forth below, the claims for relief asserted by Plaintiff in this adversary proceeding are asserted by Plaintiff in his capacity as statutory successor to the Debtor under Sections 541 and 544(b) of Title 11 of the United States Code. These claims for relief arise out of business transactions and wrongful acts taking place and/or having an intended effect in the District of Nevada. These claims for relief further allege injury to Astrata.

4.     As is more fully set forth below, Plaintiff has entered into assignment agreements with certain shareholders and is asserting claims in this adversary proceeding as an express assignee of certain direct shareholder claims against the Defendants. Such claims for relief allege injury to shareholders separate and distinct from the injury to Astrata.

5.     The Defendants have consented to jurisdiction in the District of Nevada, have purposefully availed themselves of the rights and privileges of conducting activities in Nevada, and have engaged in intentionally wrongful conduct knowing that it would have a direct and adverse impact on Debtor in the forum state.

6.     Venue is therefore proper here pursuant to the provisions of 28 U.S.C. § 1409(c).

## GENERAL ALLEGATIONS

### A.     The Parties

7.     At all relevant times between the filing of the Main Case and January 10, 2010, Astrata was a Chapter 11 debtor in possession in the Main Case. As such, Astrata held all of the rights and powers of a trustee in bankruptcy pursuant to the provisions of 11 U.S.C. § 1107.

8.     On January 10, 2010, the bankruptcy court in the Main Case entered its "Order Confirming Chapter 11 Plan of Reorganization." Pursuant to the terms of the confirmed Plan, all claims held by Astrata in its capacity as Chapter 11 debtor in possession, including without limitation the claims for relief alleged in this Complaint, were assigned to Plaintiff as the duly appointed and acting Trustee of the Litigation

-3-

Trust of Astrata Group, Inc.

9.   At all relevant times before January 10, 2010, Astrata was a corporation organized under the laws of the State of Nevada.  At all relevant times before January 10, 2010, the principal assets of Astrata were its ownership of subsidiaries, including but not limited to, its 100% ownership of Astrata (Asia Pacific) Pte. ("Astrata Asia Pacific"), and in turn, Astrata Asia Pacific's 100% ownership of Astrata (Singapore) Pte. Ltd. ("Astrata Singapore").

10.   On information and belief, Defendant Vision Opportunity China LP, is and was at all relevant times a limited partnership organized under the laws of Guernsey (the "China Fund").

11.   On information and belief, Defendant Vision Opportunity China GP Limited, is and was at all relevant times a corporate entity organized under the laws of Guernsey (the "China Fund GP") that serves as the general partner of the China Fund.

12.   On information and belief, Defendant Vision Opportunity China Fund Limited, is and was at all relevant times a corporate entity organized under the laws of Guernsey (the "China Fund Ltd.") that controls the China Fund GP.

13.   On information and belief, Defendant Vision Opportunity Master Fund, Ltd., is and was at all relevant times a Cayman Islands exempted company (the "Master Fund").

14.   On information and belief, Defendant Vision Capital Advantage Fund, L.P., is and was at all relevant times a Delaware limited partnership ("VCAF Fund" and, together with the Master Fund and the China Fund, the "Funds").

15.   On information and belief, Defendant VCAF GP, LLC, is and was at all relevant times a Delaware limited liability company (the "General Partner") that serves as the general partner of VCAF Fund.

16.   On information and belief, Defendant Vision Capital Advisors, LLC, is and was at all relevant times a Delaware limited liability company (the "Investment Manager") that serves as the investment manager of the Funds.

17.     The Vision-affiliated Defendants, described in Paragraphs 10 through 16, shall collectively be referred to herein, given their collective and conspirational acts, as "Vision."

18.     On information and belief, defendant Tridex Technologies Pte. Ltd. is and was at all relevant times a Singapore entity with its principal place of business in Singapore.

19.     On information and belief, defendant Tridex Pte. Ltd. is and was at all relevant times a Singapore entity with its principal place of business in Singapore.

20.     On information and belief, defendant QT Technologies Limited ("QT Technologies") is and was at all relevant times a Hong Kong entity with its principal place of business in Hong Kong.

21.     On information and belief, Gallen Investments Limited is and was at all relevant times a Samoan trust with its principal place of business in Samoa and a shareholder of QT Technologies.

22.     Defendant John Clough ("Clough") is an individual and was a Director of Astrata from 2008 until January 10, 2010. Clough was appointed to Astrata's Board by his good friend and long-standing business partner, Jed Frost, for the purpose of protecting Frost's investment in Astrata. Clough was also an adviser to General Atlantic, LLC a New York based private equity fund that owned a significant interest in a China-based supplier of Astrata. Clough was also a major investor in a plastics company that sought to do business with Astrata. On information and belief, Clough is a citizen of New Zealand and a resident of Hong Kong.

23.     Defendant Jed Frost ("Frost") is an individual and was at all relevant times an investor in Astrata. On information and belief, Frost is a citizen of United States and a resident of California and Indonesia.

24.     Defendant Robin Littau ("Littau") is an individual and was at all relevant times a director and manager of Astrata Asia Pacific. On information and belief, Littau is a citizen of the United States and a resident of Singapore.

25.     Fame Trading Limited ("Fame") is and was at all relevant times a company formed in the British Virgin Islands.

26.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 to 20, inclusive, and therefore sue these defendants under these fictitious names. Plaintiff will seek leave to amend this Complaint when he learns the names and capacities of these defendants.

27.     On information and belief, at all relevant times, Defendants, and each of them, were authorized and empowered by the other Defendants, and each of them, to act, and they did so act, as the agent, principal, partner, and co-conspirator of the other Defendants, and each of them, and all of the things alleged to have been done by them, and each of them, were done in the capacity of and as agents, principals, partners, and/or co-conspirators of such other Defendants.

**B.    Astrata's Telematics Business and Contracts**

28.     Astrata and its wholly-owned operating subsidiary Astrata Asia Pacific are in the business of designing and developing advanced location-based IT services and solutions (telematics) that combine GPS positioning, wireless communications (satellite or terrestrial) and geographical information technology, enabling customers to monitor, trace and control the movement and status of machinery, vehicles, personnel and other assets.

29.     Astrata's contractual relationship with Tridex, which had been the subject of a confidentiality agreement, was disclosed by Vision at the October 9, 2009 hearing during the Chapter 11 case.

30.     In early 2005, Lim Chee Kiat of Tridex Pte. Ltd. approached Astrata for the purpose of procuring on behalf of a client a telematics system to vehicles for a government customer (the "Ultimate Customer"). On November 22, 2005, Tridex Pte. Ltd. entered into an Exclusivity Agreement with Astrata wherein Astrata granted Tridex Pte. Ltd. the sole and exclusive right to buy from Astrata, and to sell, distribute and service Astrata's telematics product for the Ultimate Customer.

31.    On October 16, 2006, Tridex Technologies Pte. Ltd., as the agent and/or alter ego of Tridex Pte. Ltd., entered into a Letter of Intent with Astrata and Astrata Asia Pacific wherein it agreed to be bound by the Exclusivity Agreement and agreed to purchase units of Astrata's telematics product.    Tridex Technologies Pte. Ltd. was at all times the agent and/or alter ego of Tridex Pte. Ltd.    On information and belief, a unity of interest and ownership exists, and at all times existed, between the Tridex Technologies Pte. Ltd. and Tridex Pte. Ltd.    that they are, and at all times mentioned herein were, the alter egos of each other, and are responsible for each others' acts and/or omissions that caused damage to Plaintiff.    Adherence to the fiction that they are separate and distinct entities from each others would sanction a fraud on creditors and promote injustice.    Specifically, Technologies Pte. Ltd.'s directors sat in the offices of Tridex Pte. Ltd., were its employees, and acted according to the direction of Lim Chee Kiat, the *de facto* controlling mind and will of Tridex Pte. Ltd.    Tridex Pte. Ltd. and Tridex Technologies Pte. Ltd. are collectively referred to herein as "Tridex".

32.    According to Plaintiff's investigation, on information and belief, QT Technologies (i) was formed in Hong Kong on August 14, 2006QT Technologies Ltd. (ii) was formed by Lim Chee Kiat for the purpose of entering into the contract with the Ultimate Customer, (iii) controlled and directed the actions of Tridex, and (iv) subcontracted to Tridex.

33.    On information and belief, on a date currently unknown, Gallen Investments Ltd. was formed as a Samoan entity for the purpose of holding ownership in QT Technologies Ltd.    Gallen's ownership is currently unknown.

34.    On April 10, 2007, Tridex entered into a Supply Agreement with Astrata Singapore for the supply of Astrata's telematics product.    The initial total value of the agreement was $93,466,225.    Over time, the total value of the contract increased to $150,176,781.    Astrata's profit on the contract was calculated at $46,936,660.

35.    Astrata and its operating subsidiaries also entered into contracts with customers other than Tridex.    Astrata's profit on those other contracts was calculated at

$33,270,979.

## C.    Vision Invested in Astrata

36.    Commencing in or about 2006, Vision purchased shares of voting common stock and non-voting preferred stock in Astrata. As of July and August 2009, Vision owned (i) 2,574,058 shares of common stock in Astrata, which represented an 8.27% beneficial ownership interest in Astrata, and (ii) 55,704,760 shares of preferred stock in Astrata, which were convertible to common stock upon the terms and conditions set forth in Stock Purchase Agreements between Astrata and Vision.

37.    On information and belief, Vision's managers elected to invest primarily in the form of non-voting convertible preferred stock instead of voting common stock so that they could apply the Black-Scholes formula or similar formula to enhance immediately and artificially the valuation of their investments in Astrata and thereby immediately take their management fees as a percentage of such enhanced valuation.

38.    The Stock Purchase Agreements between Astrata and Vision incorporate the terms and condition of attached Certificates of Designation. The Certificates of Designation contain a conversion restriction which provides that if conversion from preferred stock to common stock would result in Vision having more than a 9.9% "beneficial ownership" of the common stock of Astrata, Vision could not convert unless it gave 61-days prior written notice of conversion.

39.    As of July and August 2009, Vision's ownership of 8.27% of the common stock of Astrata meant that any conversion of its preferred stock to common stock would necessarily result in Vision having a "beneficial ownership" of more than 9.9% of Astrata's common stock, thereby triggering the requirement of 61-day prior written notice before the conversion could be legally effective.

## D.    Astrata's Search for Capital and Deal With Fame Trading

40.    During the twelve months prior to May 2009, Astrata and its financial advisors searched for financing because of financial difficulties Astrata had experienced, but were unable to find suitable sources due to, among other reasons,

existing credit and equity market conditions. Astrata's business survived in large part due to management and board members investing personal funds and deferring salaries, and suppliers, customers and other interested parties providing credit, loans and financing.

41.    In 2009, when a former officer advised Astrata that his undertaking to provide $3 million of financing was, for reasons beyond his control, going to be delayed for several months, it became clear that Astrata was suffering from a critical lack of cash with short term liabilities of approximately $9.5 million and no liquid assets. In addition, Astrata's management calculated that its operating subsidiaries, particularly Astrata Asia Pacific, required approximately $8.5 million of permanent capital to fund operations.

42.    Astrata's and Astrata Asia Pacific's capital shortage became acute in the first quarter of 2009, and financing was critically required because, among other reasons, (i) the financial crisis caused customers to delay new orders, (ii) the completion of the development of a new generation of GPS systems and products took longer than expected, (iii) customers demanded changes in features and functionality that caused delays in both deliveries and R & D of new GPS systems, (iv) marketing and sales costs needed funding, (v) corporate overhead required funding, and (v) capital was needed to fund the business until it reached positive cash flow.

43.    In May 2009, Astrata obtained short-term financing from Fame. The short-term financing was in the form of two secured loan agreements that were originally due on August 14, 2009: (i) a loan facility of up to $150,000 for Astrata, and (ii) a loan facility of up to $8.5 million for Astrata Asia Pacific. The loan facilities were secured by a guaranty from Astrata and a pledge from Astrata of all of its stock in Astrata Asia Pacific. Disbursements under the loan facilities required Astrata to provide a monthly budget of expenses and were subject to Fame's approval. The purpose of Fame's short-term financing was to provide Astrata's management with time to enter into an agreement with Fame to restructure Astrata so that Fame could convert

its short-term into financing to permanent capital.

44.    In or about May 2009, Clough represented to Astrata's board members, including Tony Harrison, that Clough was uniquely qualified to negotiate the restructuring with Fame and that he would secure the agreement of Astrata's creditors and shareholders.    Clough then took the lead on behalf of Astrata in negotiating with Fame.

### E.    Clough and Vision Became Opposed to The Fame Deal

45.    On July 16, 2009, after the negotiations between Astrata and Fame resulted in an agreement regarding the restructuring of Astrata, the proposed restructuring plan was presented to Astrata's shareholders and creditors.  The plan required a 90% vote of the total dollar amount of creditors, and a 95% vote of the shareholders.  However, the plan also provided that Astrata could in its sole discretion implement the plan if less than the foregoing percentages voted in favor of the plan.  The plan essentially provided that Astrata would transfer all of its assets to a new entity in which the equity ownership would be as follows (i) 10% to existing Astrata shareholders and creditors, (ii) 20% to existing management, and (iii) 70% to Fame.

46.    Clough initially professed support for the Fame deal.  He was involved in Astrata's negotiations with Fame, stated that Fame's principal, Tim Harmon, was a "great guy," and that the Fame deal was the best thing for Astrata.  However, commencing in or about June 2009, he changed his tune and repeatedly complained to other Astrata board members that he didn't want to proceed with the Fame deal because "there is nothing in this for me so I don't want to do it anymore."

47.    Not coincidentally, Vision was opposed to the Fame deal and echoed Clough's sentiments.  According to Vision, the Fame deal was worth "practically zero" and was "practically worthless" to Vision.

### F.    The Scheme to Interfere With The Fame Deal

48.    On or about June 7, 2009, during a meeting in New York of Astrata's board of directors, Clough demanded the right to meet with Vision alone, and threw a

fit when he was informed that such a meeting was neither authorized nor approved by Astrata's board. On or about June 8, 2009, Clough nonetheless met with Vision by himself for at least one hour before the other Astrata board members attended the meeting, without the authorization or approval of Astrata's board. On or about June 9, 2009, Clough once again met alone with Vision without the authorization or approval of Astrata's board.

49.   Clough, Frost and Vision conspired and agreed, both before, during and after these meetings, to interfere with the Fame deal so that they could extract a better financial deal for themselves from Fame, and if that effort failed, to steal Astrata's assets for themselves.

50.   Commencing in or about July 2009, after Fame had funded almost $4,000,000, Clough and Vision implemented their plan to interfere with the Fame deal. Their plan was to (i) unlawfully assert control of Astrata, (ii) so they reconstitute the existing board of directors, (iii) and thus deem the Fame deal unenforceable on the grounds that it required shareholder approval, in order to gain leverage with Fame and increase their (and Frost's) financial position in the restructuring. They also recruited key employees and a key customer, Tridex and QT Technologies, to their effort. In furtherance of their scheme, Clough and Vision engaged in the following actions:

a.   Commencing in July 2009, Clough and Vision recruited current and former employees to their scheme, including but not limited to Astrata Asia Pacific Regional Manager Robin Littau, and former Chief Technology Officer Hoyt Layson, who in turn, sought to recruit other employees. Littau's phone records for the month of July show that he had at least 82 phone calls/text messages with Clough, and 92 phone calls/text messages with Clough's friend and go-between, Peter Martin. After July 2009, when Littau was confronted with such communications, they immediately ceased.

b.   On July 29, 2009, Vision informed Astrata's board that Vision was the "beneficial owner" of 58,278,818 shares of Astrata common stock and thus Astrata's majority shareholder. At that time, Vision demanded that the board of

directors be immediately reconstituted and contended that the Fame deal was unlawful because it required shareholder approval. Both Clough and Vision were sophisticated hedge fund advisors and/or investors who knew that Vision could not legally maintain that it was the "beneficial owner" of the common stock without giving the required 61-day prior written notice of conversion.

c.    On August 5, 2009, Vision sent a letter to Astrata stating "[p]lease consider this notice to convert the below listed Convertible Preferred Stock," which totaled 2,785,238 shares of preferred stock to be converted to common stock.

d.    On August 6, 2009, Vision signed a shareholder's consent removing all of Astrata's directors (Anthony Bryan, Sr., Paul Barrill, Martin Euler and Tony Harrison) except for Clough, knowing that the required 61-days prior written notice had commenced running only a day earlier and that the removal was thus unlawful.

e.    On August 7, 2009, Astrata director Martin Euler, from the Singapore office, called Clough on his cell phone while Clough was traveling from Hong Kong to China, and with Clough's knowledge and assent put the call on speaker so that it was heard by Astrata's Chief Restructuring Officer, John Bryan, and Astrata Chairman, Tony Harrison. Euler mentioned to Clough that Vision's takeover attempt was not legitimate and asked what should be done. Clough acknowledged that the takeover was not legitimate and stated words to the effect "that's how we do it at General Atlantic. We act as if we've taken over and fire everybody." Clough then chuckled and asked if Euler had gotten a hand-delivered letter yet. At the time of the call, Euler had not yet received anything.

f.    On August 7, 2009, after the above-referenced phone call of that date, Clough's letters to Euler and to Harrison arrived at Astrata's Singapore office. Clough's letters informed Euler and Harrison that on behalf of the majority shareholder, Vision, they were to cease and desist from any further involvement in the business operations of Astrata's subsidiaries, access to the office premises, communication with the staff and customers, or access to any files or property belonging to Astrata or its

COMPLAINT

1 | subsidiaries.

2 |          g.    In or about July 2009, Clough and Littau had unauthorized meetings
3 | with Tridex in order to recruit Tridex to their effort. They knew that, in 2008, Astrata's
4 | Chairman, Tony Harrison, had entered into a side letter agreement with Tridex
5 | requiring him to move to Singapore for 3 years to see through the fulfillment of the
6 | contract for the Ultimate Customer. As a result of these unauthorized meetings, Tridex
7 | and QT Technologies (i) ceased making its regular monthly payments to Astrata (the
8 | last payments of $100,000 per month were received on June 2 and July 2), and (ii)
9 | ceased all communications with Astrata Chairman Tony Harrison. On information and
10 | belief, Tridex and QT Technologies agreed to the scheme in exchange for a greater
11 | share of profits on the contract with the Ultimate Customer.

12 |          **G.    Astrata Was Forced to File For Chapter 11 Protection**

13 |          51.    Defendants knew that their interference with the Fame deal would disrupt
14 | Astrata's relationship with Fame. Indeed, as a result of such interference, Fame refused
15 | to grant Astrata further access to its loan facilities and refused to proceed with the
16 | voluntary restructuring.

17 |          52.    Defendants calculated that Astrata and Fame would have to negotiate and
18 | offer them a larger share of the pie. However, Fame refused to accede to the demands
19 | of Clough and Vision and informed Astrata that it would continue to provide financing
20 | only if a restructuring plan was approved by the court. Without Fame's financial
21 | support, Astrata was insolvent and without any other source of financing. On August 6,
22 | 2009, Astrata thus filed for Chapter 11.

23 |          53.    Defendants knew that a Chapter 11 would harm Astrata. Vision's July 29,
24 | 2009 letter to Astrata states: "[w]e have gathered specific knowledge that the
25 | relationships with several key clients would be severely and potentially irreparably
26 | harmed should the Company seek reorganization under Chapter 11 or protection under
27 | Chapter 7 of the Bankruptcy Code."

28 |          54.    As a direct and foreseeable result of the Chapter 11 filing, Astrata lost

-13-

contracts that would have generated profit of $33,270,979 or more. However, the Tridex contract remained, and Astrata's plan of reorganization was structured around the preservation of the Tridex relationship.

## H.   The Theft of The Tridex Contract And Astrata's Technology And Trade Secrets

55.   Unbeknownst to Astrata, Vision and Clough, together with their co-conspirators Frost and Littau, intended all along to steal the Tridex and QT Technologies contract for themselves if they couldn't get the deal they wanted from Fame and Astrata. Furthermore, the Defendants, and each of them, intended all along to steal Astrata's technology and trade secrets. Their plan is evidenced by the following:

a.   In June and July 2009, Clough repeatedly stated with respect to the Fame plan that "there is nothing in this for me," revealing his motive to obtain a share of the 20% equity allocated to management under the Fame plan, if not other "compensation." Clough also informed Astrata's board of directors that he was part-owner of a plastics company and wanted the company to supply Astrata.

b.   Commencing in July 2009, Clough developed an independent relationship with Tridex and QT Technologies without the knowledge, authorization or approval of Astrata's board. According to Vision, Clough had face-to-face meetings and fed Vision "information from Tridex," Clough had "a very good working relationship with the major customer," and "Clough and some other key people from Singapore [were] fully competent and capable...They will hit the ground running...."

c.   On an unknown date, Clough transmitted to Vision Astrata's confidential attorney-client communications. Specifically, Clough sent emails to Vision from Astrata's legal counsel, City Legal. According to Vision's testimony in an October 9, 2009 hearing in this Court, "our primary source of information is the independent director....John Clough...And he sent – and the emails that I've seen indicate clearly that Anthony Harrison had direct negotiations with Fame's counsel. And when Astrata's counsel, City Legal, instructed Mr. Harrison of the dangers of, you

-14-

know, bypassing the company counsel and dealing directly with Fame counsel, Mr. Harrison basically told them not worry about it."

d.   Vision refused to offer DIP financing, file a competing plan and identify the purported alternative sources of financing referenced in its July 29, 2009 letter.

e.   In August and September 2009, Vision stated separately to Astrata's counsel and John Bryan that Vision would rather spend $500,000 to destroy Astrata rather than see it succeed.

f.   In October 2009, after Astrata had disclosed in its plan of reorganization that it was forming a litigation trust to pursue legal claims, Vision sent an email to Bryan stating that "[a]ny attempt to try to draw Vision entities into a litigation claiming such interference will be considered malicious and will be responded by frivolous counterclaims by Vision against all parties involved."

g.   Commencing in June 2009, Littau suddenly refused to socialize with Astrata personnel, despite long-standing relationships with them.

h.   In July 20009, Littau had numerous secret communications with Clough and his go-between Peter Martin.

i.   In August 2009, Littau disclosed attorney-client communications to Vision.  Specifically, he forwarded  an August 11, 2009 email regarding a missing share certificate to Clough or Vision, who forwarded the email to Vision's counsel Kaaran Thomas, who in turn sent an August 11, 2009 email to Astrata counsel regarding the missing share certificate.

j.   In August 2009, Littau opened and destroyed documents regarding Frost, Clough and Vision.

k.   In September 2009,  Littau refused to provide written assurances to Astrata regarding his lack of involvement with Frost, Clough and Vision and immediately terminated his position after being presented with a request for reassurances.

l.      In September 2009, Littau improperly removed the hard drive from his Astrata Asia Pacific computer without authorization.

m.      Commencing in August 2009, Tridex and QT Technologies refused to continue funding Astrata and refused to communicate with Astrata Chairman Tony Harrison after demanding that he move to Singapore and stay there for three years.

o.      Commencing in August 2009, Tridex began to allege defects and failures with a static test, but refused to return the purportedly defective units so that Astrata could report on the causes of the alleged failure and/or show that the alleged failure was not caused by Astrata.  On October 19, 2009, Tridex declared that the time to report on the causes of the alleged failure had run out.

p.      On November 24, 2009, Tridex through its counsel notified Astrata that it was "deeply concerned" about alleged "delays, defects and substandard services" as far back as 2007.  However, in 2008, the parties had entered into an agreement that they would not raise any alleged failures prior to that date.

q.      On February 5, 2010, Tridex wrongfully purported to terminate the Supply Agreement.  By that time, Frost and Clough, together with their unspecified "affiliates," attempted to defraud Astrata and induce Astrata into providing a general release to Clough in exchange for Frost's withdrawal of his opposition to the plan of reorganization, and the Court had approved the plan of reorganization.

56.     Clough, Frost, Vision, Littau, Tridex and QT Technologies are now working together to fulfill the contract with the Ultimate Customer using Astrata's technology and trade secrets:

a.      After Tridex terminated the Supply Agreement, Littau has continued to meet with Tridex and QT Technologies in Singapore.

b.      Tridex and QT Technologies cannot fulfill the contract with the Ultimate Customer without access to Astrata's technology and trade secrets.  Tridex demanded that Astrata transfer the software for the telematics product, and Astrata transferred the software to an escrow agent that was a member of The Portcullis  Group,

which is controlled by David Chong, who is a very close friend of Tridex and QT Technologies principal Lim Chee Kiat.  Astrata recently attempted to obtain an audit of the escrow to determine whether the software has been accessed (and therefore copied and/or stolen), but has been refused an audit in blatant violation of the escrow agreement.

        c.    Clough and Frost have refused to sign a release representing and warranting that they are not involved in any way with Tridex, QT Technologies, or the fulfillment of the contract (or any related sub-contract) with the Ultimate Customer.

        d.    Tridex and QT Technologies are currently installing Astarta's telematics product for the Ultimate Customer.

## I.   Astrata's Agreement to Provide Clough and Frost a Release Was Procured by Fraud

57.   Astrata's agreement to provide Clough, Frost and their unspecified "affiliates" with a general release was secured by fraud.  Had Astrata known of their intent to steal Astrata's assets which formed the basis of the plan of reorganization, Astrata would never have considered providing them with a release.

## FIRST CLAIM FOR RELIEF

### (Intentional Interference With Contractual Relations)

### (By Plaintiff Against Clough, Vision, Littau, Tridex, QT Technologies)

58.   Plaintiff realleges paragraphs 1 through 57 of this Complaint.

59.   Astrata had a valid and existing contract with Fame with respect to the financing and restructuring of the company.

60.   At all relevant times, Clough, Vision and Tridex knew of the existence of the contract.

61.   Defendants conspired and agreed to engage in, and engaged in, acts designed to disrupt the contractual relationship, for their own personal financial gain, consisting of, *inter alia*, the following:

        a.    On July 29, 2009, Vision knowingly and unlawfully asserted that it was the "beneficial owner" of 58,278,818 shares of Astrata common stock, in violation

-17-

of SEC Rule 13d-3;

b. On August 6, 2009, Vision knowingly and unlawfully held a shareholders' meeting and signed a written consent removing all of Astrata's directors, except Clough;

c. On August 7, 2009, Clough knowingly and unlawfully directed that Astrata directors Tony Harrison and Martin Euler were prohibited from having any access to Astrata's offices, customers, documents and business, and Clough notified them that their employment was terminated immediately;

d. In July 2009, Clough secretly recruited Astrata personnel to the unlawful takeover effort, including but not limited to Littau and Layson;

e. In July 2009, Clough and Littau secretly convinced Tridex to go along with their coup attempt, and as a result, Tridex refused to provide regular monthly funding to Astrata and refused to speak with Tony Harrison.

62. Defendants' actions caused the actual disruption of the contractual relationship. Specifically, Fame refused to grant any further access to its loan facilities, refused to proceed with the voluntary restructuring plan, and informed Astrata that any further financing would only be provided pursuant to a court ordered restructuring plan.

63. As a direct and proximate result of Defendants' actions, Astrata was rendered insolvent, and was forced to file for Chapter 11. As a direct and foreseeable consequence of the Chapter 11 filing, Astrata suffered the following damages: (i) lost profits from contracts (not including the Tridex contract) calculated at \$33,270,979; (ii) lost enterprise value, of at least \$300,000,000, in an amount to be proven at trial; (iii) Chapter 11 transaction costs of at least \$1,000,000 in an amount to be proven at trial; (iv) pre-judgment interest; and (v) other damages to be proven at the time of trial.

64. The Defendants' actions were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata. Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter

similar future conduct.

## SECOND CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage)

### (By Plaintiff Against Clough, Vision, Littau, Tridex, QT Technologies)

65.     Plaintiff realleges paragraphs 1 through 64 of this Complaint.

66.     Astrata had prospective economic relations with Fame with respect to the financing and restructuring of the company.

67.     At all relevant times, Clough, Vision, Tridex and QT Technologies knew of the existence of the prospective economic relations.

68.     Defendants conspired and agreed to engage in, and engaged in, acts designed to disrupt the prospective economic relationship, for their own personal financial gain, consisting of, *inter alia*, the following:

   a.     On July 29, 2009, Vision knowingly and unlawfully asserted that it was the "beneficial owner" of 58,278,818 shares of Astrata common stock, in violation of SEC Rule 13d-3;

   b.     On August 6, 2009, Vision knowingly and unlawfully held a shareholders' meeting and signed a written consent removing all of Astrata's directors, except Clough;

   c.     On August 7, 2009, Clough knowingly and unlawfully directed that Astrata directors Tony Harrison and Martin Euler were prohibited from having any access to Astrata's offices, customers, documents and business, and Clough notified them that their employment was terminated immediately;

   d.     In July 2009, Clough secretly recruited Astrata personnel to the unlawful takeover effort, including but not limited to Littau and Layson;

   e.     In July 2009, Clough and Littau secretly convinced Tridex and QT Technologies to go along with their coup attempt, and, as a result, Tridex and QT Technologies refused to provide regular monthly funding to Astrata and refused to speak with Tony Harrison.

69.     Defendants' actions caused the actual disruption of the prospective economic relationship.  Specifically, Fame refused to grant any further access to its loan facilities, refused to proceed with the voluntary restructuring plan, and informed Astrata that any further financing would only be provided pursuant to a court ordered restructuring plan.

70.     As a direct and proximate result of Defendants' actions, Astrata was rendered insolvent, and was forced to file for Chapter 11. As a direct and foreseeable consequence of the Chapter 11 filing, Astrata suffered the following damages: (i) lost profits from contracts (not including the Tridex and QT Technologies contract) calculated at $33,270,979; (ii) lost enterprise value, of at least $300,000,000, in an amount to be proven at trial; (iii) Chapter 11 transaction costs of at least $1,000,000 in an amount to be proven at trial; (iv) pre-judgment interest; and (v) other damages to be proven at the time of trial.

71.     The Defendants' actions were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata.  Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (By Plaintiff Against Clough, and Vision, Littau, Tridex, QT Technologies
### as Co-conspirators and/or Aiders and Abetters)

72.     Plaintiff realleges paragraphs 1 through 71 of this Complaint.

73.     As a director of Astrata from 2008 until January 10, 2010, Clough owed Astrata a fiduciary duty to act in the utmost good faith and in the best interests of Astrata.  Clough owed duties of care and loyalty which required him to avoid damaging Astrata and to preserve and protect the assets of Astrata, including but not limited to the value of its subsidiaries, its contracts and its trade secrets.  Any purported waiver or

COMPLAINT

limitation of these duties is void as against public policy.

74.    Clough violated his fiduciary duties to Astrata by engaging in intentional misconduct and knowing violations of law, consisting of the following:

a.    Intentionally interfering with the Fame deal, for personal financial gain, as aforesaid;

b.    Participating in and facilitating the disclosure of privileged, confidential and trade secret information, for personal financial gain, as aforesaid; and

c.    Participating in and facilitating the theft of assets for personal financial gain, as aforesaid.

75.    Vision, Littau, Tridex and QT Technologies conspired and agreed with Clough, and aided and abetted Clough, in his breach of fiduciary duties, as more fully set forth in Paragraphs 50, 55-56.

76.    As a direct and proximate result of Defendants' actions, Astrata was rendered insolvent and was forced to file for Chapter 11.  As a direct and foreseeable consequence of the Chapter 11 filing, Astrata suffered the following damages: (i) lost profits from contracts (not including the Tridex and QT Technologies contract) calculated at $33,270,979; (ii) lost profits on the Tridex contract calculated at $46,936,660; (iii) lost enterprise value, of at least $300,000,000, in an amount to be proven at trial; (iv) Chapter 11 transaction costs of at least $1,000,000 in an amount to be proven at trial; (v) pre-judgment interest; and (vi) other damages to be proven at the time of trial.

77.    The Defendants' actions were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata.  Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

COMPLAINT

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (By Plaintiff Against Clough, and Vision and Littau as Co-conspirators and/or Aiders and Abetters)

78.     Plaintiff realleges paragraphs 1 through 77 of this Complaint.

79.     As a director of Astrata from 2008 until January 10, 2010, Clough owed Astrata a fiduciary duty to act in the utmost good faith and in the best interests of Astrata. Clough owed duties of care and loyalty which required him to avoid damaging Astrata and to preserve and protect the assets of Astrata, including but not limited to the value of its subsidiaries, its contracts and its trade secrets. Any purported waiver or limitation of these duties is void as against public policy.

80.     Clough violated his fiduciary duties to Astrata by engaging in intentional misconduct and knowing violations of law by intentionally usurping the opportunity to do business with Tridex, as aforesaid.

81.     Vision and Littau conspired and agreed with Clough, and aided and abetted Clough, in his breach of fiduciary duties, as more fully set forth in Paragraphs 50, 55-56.

82.     As a direct and proximate result of Defendants' actions, Astrata was rendered insolvent and was forced to file for Chapter 11. As a direct and foreseeable consequence of the Chapter 11 filing, Astrata suffered the following damages: (i) lost profits on the Tridex contract calculated at $46,936,660; (ii) lost enterprise value, of at least $300,000,000, in an amount to be proven at trial; (iii) pre-judgment interest; and (iv) other damages to be proven at the time of trial.

83.     The Defendants' actions were willful and malicious, were motivated solely out of their own greed, and were in conscious disregard for the rights of Astrata. Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

COMPLAINT

## FIFTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (By Plaintiff Against Littau and Clough, Vision, Tridex, QT Technologies as Co-conspirators and/or Aiders and Abetters)

84.    Plaintiff realleges paragraphs 1 through 83 of this Complaint.

85.    Among the rights and powers of Plaintiff in bringing this action are all of the rights and powers of Astrata, both pre-petition and as debtor in possession, including all of its rights as the 100% shareholder of Astrata Asia Pacific and all derivative claims related thereto.

86.    As a Manager of Astrata Asia Pacific from  2008 until September 2009, Littau owed Astrata a fiduciary duty to act in the utmost good faith and in the best interests of Astrata.  Littau owed duties of care and loyalty which required him to avoid damaging Astrata and to preserve and protect the assets of Astrata, including but not limited to the value of its subsidiaries, its contracts and its trade secrets.  Any purported waiver or limitation of these duties is void as against public policy.

87.    Littau violated his fiduciary duties to Astrata Asia Pacific by engaging in intentional misconduct and knowing violations of law, consisting of the following:

a.    Intentionally interfering with the Fame deal, for personal financial gain, as aforesaid;

b.    Participating in and facilitating the disclosure of privileged, confidential and trade secret information, for personal financial gain, as aforesaid; and

c.    Participating in and facilitating the theft of assets for personal financial gain, as aforesaid.

88.    Vision, Clough, Tridex and QT Technologies conspired and agreed with Littau, and/or aided and abetted Littau in his breach of fiduciary duties, as more fully set forth in Paragraphs 50, 55-56.

89.    As a direct and proximate result of Defendants' actions, Astrata was rendered insolvent and was forced to file for Chapter 11.  As a direct and foreseeable

-23-

consequence of the Chapter 11 filing, Astrata suffered the following damages: (i) lost profits from contracts (not including the Tridex and QT Technologies contract) calculated at $33,270,979; (ii) lost profits on the Tridex and QT Technologies contract calculated at $46,936,660; (iii) lost enterprise value, of at least $300,000,000, in an amount to be proven at trial; (iv) Chapter 11 transaction costs of at least $1,000,000 in an amount to be proven at trial; (v) pre-judgment interest; and (vi) other damages to be proven at the time of trial.

90.    The Defendants' action were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata.  Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

## SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

**(By Plaintiff as Assignee of Shareholder Claims Against Clough, and Vision, Littau, Tridex, QT Technologies as Co-conspirators and/or Aiders and Abetters)**

91.    Plaintiff realleges paragraphs 1 through 90 of this Complaint.

92.    Plaintiff is the express assignee of certain shareholder claims against the Defendants, as alleged below, which are separate and distinct from any derivative claims held by Plaintiff in his capacity as statutory successor to the Debtor under Sections 541 and 544(b) of Title 11 of the United States Code.  These claims for relief allege injury to shareholders separate and distinct from the injury to Astrata.

93.    As a director of Astrata from 2008 until January 10, 2010, Clough owed Astrata's shareholders a fiduciary duty to act in the utmost good faith and in their best interests.  Clough owed duties of care and loyalty which required him to avoid damaging Astrata and to preserve and protect the assets of Astrata, including but not limited to the value of its subsidiaries, its contracts and its trade secrets.  Any purported waiver or limitation of these duties is void as against public policy.

94.    Clough violated his fiduciary duties to Astrata shareholders/assignors by engaging in intentional misconduct and knowing violations of law, consisting of the following:

a.    Intentionally interfering with the Fame deal, for personal financial gain, as aforesaid;

b.    Participating in and facilitating the disclosure of privileged, confidential and trade secret information, for personal financial gain, as aforesaid; and

c.    Participating in and facilitating the theft of assets  for personal financial gain, as aforesaid.

95.    Vision, Littau, Tridex and QT Technologies conspired and agreed with Clough, and/or aided and abetted Clough, in his breach of fiduciary duties, as more fully set forth in Paragraphs 50, 55-56.

96.    As a direct and proximate result of Defendants' actions, the shareholders/ assignors were deprived of the benefits of the voluntary restructuring plan, and Plaintiff/assignee is entitled to recover the following damages: (i) the difference in the value of the shareholders/assignors' interests under the voluntary restructuring plan and the plan of reorganization approved by the court, and (ii) other damages to be proven at the time of trial.

97.    The Defendants' actions were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata.  Plaintiff/assignee is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (Trespass to Chattels)

**(By Plaintiff as Assignee of Shareholder Claims Against Vision, and Clough, Littau, Tridex, QT Technologies as Co-conspirators and/or Aiders and Abetters)**

98.    Plaintiff realleges paragraphs 1 through 97 of this Complaint.

99.    Plaintiff is the assignee of certain shareholder claims against the Defendants, as alleged below, which are separate and distinct from any derivative claims held by Plaintiff in his capacity as statutory successor to the Debtor under Sections 541 and 544(b) of Title 11 of the United States Code. These claims for relief allege injury to shareholders separate and distinct from the injury to Astrata.

100.    The shareholders/assignors owned, possessed and had a right to possess their common stock in Astrata.

101.    Vision intentionally interfered with the  assignor-shareholders' rights of ownership, possession and/or rights of possession by knowingly and unlawfully (i) asserting that it was the "beneficial owner" of a majority share of Astrata common stock, in violation of SEC Rule 13d-3, (ii) signing a written consent removing all of Astrata's directors, except Clough, and (iii) authorizing Clough to prohibit Astrata directors Tony Harrison and Martin Euler from having any access to Astrata's offices, customers, documents and business.

102.    The shareholders/assignors did not consent to Vision's assertion of ownership of their Astrata common stock.

103.    Clough, Littau, Tridex and QT Technologies conspired and agreed with Vision, and/or aided and abetted Vision, in the trespass to chattels, as more fully set forth in Paragraphs 50, 55-56.

104.    As a direct and proximate result of Defendants' actions, the shareholders/assignors were deprived of the benefits of the voluntary restructuring plan, and Plaintiff/assignee is entitled to recover the following damages: (i) the difference in the value of the shareholders/assignors' interests under the voluntary restructuring plan and

the plan of reorganization approved by the court, and (ii) other damages to be proven at the time of trial.

105. The Defendants' actions were willful and malicious, were motivated solely out of their own greed and desire to extract better terms for themselves from Fame, and were in conscious disregard for the rights of Astrata. Plaintiff/assignee is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

## EIGHTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets

### NRS 600A.050)

### (By Plaintiff Against All Defendants)

106. Plaintiff realleges paragraphs 1 through 105 of this Complaint.

107. Astrata was the owner of legal and/or equitable title to the following trade secrets: (a) the identity of key customers; (b) confidential financial information; (c) key contract terms with customers; (d) the plans and specifications of customers; (e) the identities of key suppliers; and (e) proprietary technology and know-how.

108. The trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use, and were the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

109. On information and belief, Defendants misappropriated the trade secrets through: (a) the acquisition of the trade secret of another by a person by improper means; (b) the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; and (c) the disclosure or use of a trade secret of another without express or implied consent by a person who: (1) used improper means to acquire knowledge of the trade secret; and (2) at the time of disclosure or use, knew or had reason to know that his or her knowledge

of the trade secret was: (I) derived from or through a person who had used improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; and (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

110.    Plaintiff is informed and believes and thereon alleges that Defendants used improper means to acquire the trade secrets, including, without limitation: (a) theft; (b) misrepresentation; and (c) willful breach and willful inducement of a breach of a duty to maintain secrecy.

111.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered the following damages: (i) lost profits from contracts (other than the Tridex and QT Technologies contract) calculated at $33,270,979; (ii) lost profits on the Tridex and QT Technologies contract calculated at $46,936,660; (iii) lost enterprise value, of at least $300,000,000, in an amount to be proven at trial; (iv) Chapter 11 transaction costs of at least $1,000,000 in an amount to be proven at trial; (v) pre-judgment interest; and (vi) other damages to be proven at the time of trial.

112.    Since the misappropriation was willful, wanton, reckless or in disregard of Plaintiff's rights, Plaintiff is entitled to exemplary damages under NRS 600A.050 (2).

113.    Since the misappropriation was willful and malicious, Plaintiff is entitled to attorney's fees under NRS 600A.060 (3).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests judgment against the Defendants, as follows:

1.    For compensatory damages according to proof, plus prejudgment interest thereon at the legal rate;

2.    For disgorgement and restitution of all ill-gotten gains and unjust enrichment obtained by Defendants;

3.    For punitive and exemplary damages against all Defendants;

4.    For an injunction prohibiting Defendants from selling, distributing or

servicing  Astrata's telematics product to the Ultimate Customer;

5.    For costs of suit incurred herein, including reasonable attorneys' fees;

6.    For pre-judgment interest; and

7.    For such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Date: June 11, 2010           HARTMAN & HARTMAN and
AFFELD GRIVAKES ZUCKER
LLP


//s//  Jeffrey L. Hartman

_____

JEFFREY L. HARTMAN
Attorneys for plaintiff, JOHN BRYAN,
TRUSTEE, THE LITIGATION TRUST OF
ASTRATA GROUP, INC.

COMPLAINT