HARTMAN & HARTMAN
  Jeffrey L. Hartman, NV Bar 1607
  jlh@bankruptcyreno.com
510 West Plumb, Ste. B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818

AFFELD GRIVAKES ZUCKER LLP
  Christopher Grivakes, NV Bar 7725
  cg@agzlaw.com
12400 Wilshire Blvd., Ste 1180
Los Angeles, CA 90025
T: (310) 979-8700
F. (310) 979-8701

Attorneys for plaintiff, JOHN BRYAN, TRUSTEE,
THE LITIGATION TRUST OF ASTRATA GROUP, INC.

E-filed on September 17, 2012

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:  ASTRATA GROUP INC.,

        Debtor,

JOHN BRYAN, TRUSTEE,  THE LITIGATION TRUST OF ASTRATA GROUP, INC.,

        Plaintiff,
vs.

VISION OPPORTUNITY CHINA LP, a Guernsey limited partnership, VISION OPPORTUNITY CHINA FUND LIMITED, a Guernsey corporation, VISION OPPORTUNITY MASTER FUND, LTD., a Cayman Islands company,  VISION CAPITAL ADVANTAGE FUND, L.P., a Delaware limited partnership, VCAF GP, LLC, a Delaware limited liability company, VISION CAPITAL ADVISORS, LLC, a

BK- 09-52652-GWZ
CHAPTER 11

ADVERSARY NO: 10-05039
THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF for:
  1.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
  2.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AS ASSIGNEE OF FAME)
  3.  BREACH OF FIDUCIARY DUTY
  4.  MISAPPROPRIATION OF TRADE SECRETS

-1-

Delaware limited liability company,
CARRICK JOHN CLOUGH, an individual,
JED FROST, an individual, ROBIN
LITTAU, an individual,

     Defendants.

_____

## SUMMARY OF ACTION

1.     This case involves the intentional interference in the prospective contractual relationship between Astrata Group, Inc. ("Astrata" or "Debtor") and Fame Trading, Inc. ("Fame") by Astrata's preferred shareholders (the "Vision" entities) and former director Carrick John Clough ("Clough"). The interference consisted of the unlawful assertion of majority ownership in Astrata, and attempt to reconstitute its board of directors, in order to terminate the relationship between Astrata and Fame with respect to the pre-petition financing and the restructuring of Astrata. The direct, proximate and foreseeable result of the interference was the filing of a Chapter 11 petition and the resulting loss of key contracts and lost profits.

2.     In addition, Clough secretly conspired to steal Astrata's key contracts, and was aided and abetted by Astrata Asia Pacific managing director Robin Littau and Astrata creditor Jed Frost.

## JURISDICTION AND VENUE

3.     In August 2009, Astrata filed a its voluntary petition for relief under Title 11 of the United States Code in the United States Bankruptcy Court for the District of Nevada, Case No. 09-52652-GWZ (the "Main Case"). The Main Case remains pending in that Court. The present action is a civil proceeding arising out of and related to the Main Case. The present action is a "core" proceeding under 28 U.S.C. §§ 157(b)(2)(A), (C) and (O). This court has jurisdiction over this matter under Sections 157 and 1334 of Title 28 of the United States Code. To the extent applicable, Plaintiff consents to entry of final judgment by the Court on any non-core claims.

4.     On January 10, 2010, the bankruptcy court in the Main Case entered its

"Order Confirming Chapter 11 Plan of Reorganization." Pursuant to the terms of the confirmed Plan, all claims held by Astrata in its capacity as Chapter 11 debtor in possession, including without limitation the claims for relief alleged in this Complaint, were assigned to Plaintiff as the duly appointed and acting Trustee of the Litigation Trust of Astrata (the "Trust" or "Plaintiff"). The claims for relief asserted by Plaintiff in this adversary proceeding are asserted by Plaintiff in his capacity as statutory successor to the Debtor under Sections 541 and 544(b) of Title 11 of the United States Code.

5.      Plaintiff's claims for relief arise out of business transactions and wrongful acts taking place and/or having an intended effect in the District of Nevada. These claims for relief further allege injury to Astrata. The Defendants have consented to jurisdiction in the District of Nevada, have purposefully availed themselves of the rights and privileges of conducting activities in Nevada, and have engaged in intentionally wrongful conduct knowing that it would have a direct and adverse impact on Debtor in the forum state. Venue is proper here pursuant to the provisions of 28 U.S.C. § 1409(c).

## ASSIGNMENT OF CLAIMS

6.      On October 29, 2010, the Trust entered into an assignment agreement with Fame Trading, Inc. ("Fame") which assigns and transfers to Astrata all of Fame's rights, title and interest in its claims against Vision and the other defendants.

## GENERAL ALLEGATIONS

### A.      The Parties

7.      At all relevant times before January 10, 2010, Astrata was a publicly traded corporation organized under the laws of the State of Nevada. At all relevant times between the filing of the Main Case and January 10, 2010, Astrata was a Chapter 11 debtor in possession in the Main Case. As such, Astrata held all of the rights and powers of a trustee in bankruptcy pursuant to the provisions of 11 U.S.C. § 1107. Astrata's principal assets were its 100% ownership of Astrata (Asia Pacific) Pte. ("Astrata Asia Pacific"), which in turn owned 100% ownership of Astrata (Singapore)

THIRD AMENDED COMPLAINT

Pte. Ltd. ("Astrata Singapore").

8.      On information and belief, Defendant Vision Opportunity China LP, is and was at all relevant times a limited partnership organized under the laws of Guernsey (the "China Fund").

9.      On information and belief, Defendant Vision Opportunity China GP Limited, is and was at all relevant times a corporate entity organized under the laws of Guernsey (the "China Fund GP") that serves as the general partner of the China Fund.

10.     On information and belief, Defendant Vision Opportunity China Fund Limited, is and was at all relevant times a corporate entity organized under the laws of Guernsey (the "China Fund Ltd.") that controls the China Fund GP.

11.     On information and belief, Defendant Vision Opportunity Master Fund, Ltd., is and was at all relevant times a Cayman Islands exempted company (the "Master Fund").

12.     On information and belief, Defendant Vision Capital Advantage Fund, L.P., is and was at all relevant times a Delaware limited partnership ("VCAF Fund" and, together with the Master Fund and the China Fund, the "Funds").

13.     On information and belief, Defendant VCAF GP, LLC, is and was at all relevant times a Delaware limited liability company (the "General Partner") that serves as the general partner of VCAF Fund.

14.     On information and belief, Defendant Vision Capital Advisors, LLC, is and was at all relevant times a Delaware limited liability company (the "Investment Manager") that serves as the investment manager of the Funds.

15.     The Vision-affiliated Defendants, described in Paragraphs 10 through 14, shall collectively be referred to herein, given their collective and conspirational acts, as "Vision."

16.     Defendant Carrick John Clough ("Clough") is an individual and was a Director of Astrata from 2008 until January 10, 2010.  Clough was appointed to Astrata's Board by his good friend and long-standing business partner, Jed Frost, for

the purpose of protecting Frost's investment in Astrata.  Clough was also an adviser to General Atlantic, LLC a New York based private equity fund that owned a significant interest in a China-based supplier of Astrata.  Clough was also a major investor in a plastics company that sought to do business with Astrata.  On information and belief, Clough is a citizen of New Zealand and a resident of Hong Kong, Special Administrative Region, China.

17.    Defendant Jed Frost ("Frost") is an individual and was at all relevant times an investor in Astrata.  On information and belief, Frost is a citizen of United States and a resident of California and Indonesia.

18.    Defendant Robin Littau ("Littau") is an individual and was at all relevant times a director and manager of Astrata Asia Pacific.  On information and belief, Littau is a citizen of the United States and a resident of Singapore.

19.    Fame Trading Limited ("Fame") is and was at all relevant times a company formed in the British Virgin Islands.

20.    On information and belief, at all relevant times, Defendants, and each of them, were authorized and empowered by the other Defendants, and each of them, to act, and they did so act, as the agent, principal, partner, and co-conspirator of the other Defendants, and each of them, and all of the things alleged to have been done by them, and each of them, were done in the capacity of and as agents, principals, partners, and/or co-conspirators of such other Defendants.

### B.    Astrata's Telematics Business and Contracts

21.    Astrata and its wholly-owned operating subsidiary Astrata Asia Pacific were in the business of designing and developing advanced location-based IT services and solutions (telematics) that combine GPS positioning, wireless communications (satellite or terrestrial) and geographical information technology, enabling customers to monitor, trace and control the movement and status of machinery, vehicles, personnel and other assets.

22.    The Tridex Contracts.  In early 2005, Tridex Pte. Ltd. ("Tridex")

approached Astrata for the purpose of procuring on behalf of a client a telematics system for vehicles for a government customer (the "Ultimate Customer").  The system was specified to provide the Ultimate Customer with the covert ability to locate and monitor all vehicles in its Territory, to save the history of the locations a vehicle visits so that it can be examined later, to control vehicle speed and even shut vehicles down if they were deemed to be a risk allowing the authorities to intercept such vehicles, and finally, to eavesdrop, record, and monitor conversations within the vehicles.  On information and belief, this controversial program was opposed by one government faction, but the ruling family gave it the green light.

23.     On November 22, 2005, Tridex entered into an Exclusivity Agreement with Astrata wherein Astrata granted Tridex the sole and exclusive right to buy from Astrata, and to sell, distribute and service Astrata's telematics product for the Ultimate Customer.

24.     On October 16, 2006, Tridex Technologies Pte. Ltd., as the agent and/or alter ego of Tridex, entered into a Letter of Intent with Astrata and Astrata Asia Pacific wherein it agreed to be bound by the Exclusivity Agreement and agreed to purchase units of Astrata's telematics product.

25.     On April 10, 2007, Tridex Technologies entered into a Supply Agreement with Astrata Singapore for the supply of Astrata's telematics product.  As  a condition of Tridex Technologies' entering into the Supply Agreement, Astrata was required to enter into an agreement guaranteeing the obligations in the Supply Agreement.

**C.     Astrata's Contracts With Fame For Short-Term Financing**

26.     During the twelve months prior to May 2009, Astrata and its financial advisors searched for financing because of financial difficulties Astrata had experienced, but were unsuccessful due to, among other reasons, existing credit and equity market conditions.  Vision refused to provide any further capital to Astrata. Astrata's cash needs became so desperate that if no immediate financing was secured, a Chapter 11 filing was the only alternative.

THIRD AMENDED COMPLAINT

27.    On May 14th, 2009, Astrata finally succeeded in raising some funds, and entered into written agreements with Fame with respect to short-term financing ("Short-Term Financing"), on the following terms and conditions:

(a)    Fame agreed to provide a 90-day a loan facility of up to $150,000 to Astrata that would mature on August 14, 2009;

(b)    Fame agreed  to provide a 90-day loan facility of up to $8.5 million to Astrata Asia Pacific that would mature on August 14, 2009 (of which only about $4 million was drawn down);

(c)    Astrata guarantied both of the loan facilities;

(d)    Astrata pledged all of its stock in Astrata Asia Pacific as security for both of the loan facilities;

(d)    Fame retained the right to approve any disbursements of funds under both of the facilities.

28.    In or about early June 2009, Vision was informed of Astrata's dealings with Fame.

29.    The purpose of the Short-Term Financing was to provide Astrata and Fame with sufficient time to develop a plan for permanent financing that would replace the Short-Term Financing before it became due on August 14, 2009.

**D.    Astrata's Prospective Economic Relations With Fame Regarding The Permanent Financing**

30.    From May through June 19, 2009, Astrata and Fame negotiated the terms and conditions of a plan for the permanent financing and restructuring of Astrata (the "Permanent Financing").

31.    The Permanent Financing was intended to replace the Short-Term Financing that due and payable on August 14, 2009.

32.    On or about June 19, 2009, Astrata and Fame agreed to the terms and conditions of the Permanent Financing, which was markedly different than the terms and conditions of the Short-Term Financing, as follows:

(a)    A new entity would be formed;

-7-
THIRD AMENDED COMPLAINT

(b)     Astrata would contribute all of its assets to the new entity, including its shares in all of its subsidiaries;

(c)     The new entity would be capitalized with up to $8.5 million by Fame in the form of new money and a credit for the approximate $4 million that had been drawn down on the Short-Term Financing as of late July 2009;

(d)     The new entity would be owned 3.5% by consenting creditors, 5% by consenting preferred stockholders, 1.5% by common stock holders, and 90% by Fame (from which Fame could allocate 20% to management in its discretion);

(e)     The new entity would issue a two-year cash flow note for unsecured creditors; and

(f)     The remaining public shell would be equally owned by creditors, consenting common stockholders, and consenting preferred stockholders.

33.     On June 23, 2009, Astrata held a board meeting wherein it unanimously approved the Permanent  Financing.

34.     The Permanent Financing required Astrata to obtain the approval of 90% of its creditors and 95% of its preferred shareholders by July 31, 2009.  However, Astrata retained the right to implement the Permanent Financing, in its sole discretion, if less than the foregoing percentages voted in favor of the Permanent Financing, so as to avoid Fame's foreclosure on all of Astrata's assets on August 14, 2009 when the Short-Term Financing became due.

35.     On or about July 16, 2009, the Permanent  Financing was sent to creditors and preferred shareholders.  Approximately 57% of Astrata's creditors voted in favor of the Permanent Financing.

**E.      Vision's Intentional Interference With The Permanent Financing**

36.     **Vision's intent to interfere.**  Vision continued to negotiate with Fame for more equity in the new entity to be created in conjunction with the Permanent Financing.  Vision demanded  a 20% ownership interest, instead of the proposed 5% interest, in exchange for its vote in favor of the Permanent Financing.

THIRD AMENDED COMPLAINT

37.    However, Vision faced severe time pressures that substantially weakened its negotiating position: (a) If the Permanent Financing was not implemented before the August 14, 2009 maturity date on the Short-term Financing, Fame could call the Short-Term Financing and foreclose on all of Astrata's assets; (b) Astrata had reserved the right to implement the Permanent Financing even if it did not get the votes it wanted, in order to avoid foreclosure on its assets; (c) Even though Vision had a large non-voting preferred position that upon conversion to voting common stock would have given it control of Astrata, Vision could not convert its shares without giving 61-days prior written notice, which was well after the August 14, 2009 deadline.

38.    Faced with the looming August 14 deadline, and the inability to timely convert its shares so as to assume control of Astrata, Vision resolved to interfere with the Permanent Financing by unlawfully asserting control of Astrata. On July 29, 2009, Vision sent a letter to Astrata's board of directors stating that "we intend to reverse the Company's recent actions", requesting that the Astrata board be immediately reconstituted, and expressing its intent to vote against the Permanent Financing. Vision then voted against the Permanent Financing, considering it "practically worthless".

39.    **Vision could not lawfully prevent the Permanent Financing.** Vision knew that it could not lawfully prevent Astrata from implementing the Permanent Financing before the August 14, 2009 maturity date on the Short-Term Financing. The only way Vision could prevent the Permanent Financing was to reconstitute Astrata's board of directors and reverse the board's approval of the Permanent Financing. However, Vision could not obtain control of the board without first converting its preferred stock to common stock -- it had only 2,574,058 common shares (or 8.27% of the vote), but could convert its preferred shares into an additional 55,704,760 common shares and obtain a more than 60% voting interest upon conversion. But Vision couldn't convert its stock before August 14, 2009 because it had to give 61-days prior written notice of conversion before its conversion would be effective. Vision's Stock Purchase Agreements with Astrata incorporate Certificates of Designation which

THIRD AMENDED COMPLAINT

provide that any conversion resulting in a "beneficial ownership" of more than 9.9% required 61-days prior written notice. Since the conversion would raise Vision's beneficial ownership from 8.27% to over 60%, the 61-day written notice requirement applied.

40. **Vision unlawfully reconstituted Astrata's board of directors to interfere with the Permanent Financing.** On July 29, 2009, Vision falsely asserted that it was the "beneficial owner" of 58,278,818 shares of Astrata common stock without having giving notice of conversion and without having an effective conversion, in violation of SEC Rule 13d-3. On August 5, 2009, Vision sent a letter to Astrata giving formal notice of converting its preferred stock to common stock. On August 6, 2009, Vision held a shareholders' meeting and signed a written consent removing four out of five of Astrata's directors. The shareholders' meeting was unlawful because at the time of the meeting Vision had less than 9% of the voting stock in Astrata and thus didn't have the majority vote required to call a special shareholders' meeting to remove directors. On August 7, 2009, while acting on behalf of Vision, Clough sent a letter to all of the other directors terminating them as officers and directors of Astrata.

41. **Vision's interference actually disrupted the Permanent Financing.** On or about August 6, 2009, Astrata's board of directors informed Fame of Vision's unlawful attempt to assume control of the board of directors. On or about that same date, Fame informed Astrata's board that it would not agree to provide the $8.5 million in Permanent Financing to replace the $4 million in Short-Term Financing due on August 14, 2009 since any continued investment would be in jeopardy of being entirely lost or tied up in litigation unless there was a court-approved Chapter 11 restructuring plan. On information and belief, had Vision not elected to interfere with the Permanent Financing, and instead continued to negotiate for better terms under the Permanent Financing, Fame and Vision would have been able to come to an agreement and avoid a Chapter 11 filing.

42. **Vision's interference caused damage to Astrata.** Vision's interference

THIRD AMENDED COMPLAINT

with the Permanent Financing rendered Astrata insolvent and caused Astrata to file for Chapter 11.  As a direct result of the Chapter 11 filing, Astrata sustained damages that it would not have sustained if there had been no Chapter 11:

(a)   Approximately $1,500,000 in Chapter 11 administrative costs were incurred that would not have been incurred had the Permanent Financing been implemented before the Chapter 11.

(b)   The Chapter 11 filing caused the loss of key contracts entered into by Astrata and its subsidiaries and lost profits from those contracts.  Vision knew that these were foreseeable damages.  On July 29, 2009, Vision informed Astrata in writing that:

> "[w]e have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the Company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code."

As Vision predicted, on February 5, 2010, Tridex terminated its contracts with Astrata and its subsidiaries.

(c)   The Chapter 11 filing affected the enterprise value of Astrata by reducing its equity valuation to nothing.  The equity value would not have been destroyed if there had been no Chapter 11 filing.

(d)   The Chapter 11 filing caused a disruption of the normal business operations of Astrata and its subsidiaries, which suffered a consequent loss of cash flow.

43.   **Vision's malicious intent.**  In August and September 2009, Vision stated separately to Astrata's counsel and to John Bryan that Vision would rather spend $500,000 to destroy Astrata rather than see it succeed.  In October 2009, after Astrata had disclosed in its plan of reorganization that it was forming a litigation trust to pursue legal claims, Vision sent an email to Bryan stating that "[a]ny attempt to try to draw

Vision entities into a litigation claiming such interference will be considered malicious and will be responded by frivolous counterclaims by Vision against all parties involved."

### F.    Clough's Breach of Fiduciary Duty

44.    **Clough owed a fiduciary duty.** Clough owed a fiduciary to Astrata as a director of the company.  He breached his fiduciary duty by participating in Vision's interference with the Permanent Financing and attempting to reconstitute Astrata's board of directors and by stealing the Tridex contracts, as set forth below.

45.    **Clough's motive for breach.**  In June and July 2009, Clough repeatedly stated to other Astrata directors with respect to the Permanent Financing that "there is nothing in this for me so I don't want to do it anymore". On information and belief, Clough was motivated to find an arrangement that personally benefited himself, and entered into secret arrangements with Vision initially, and later with Tridex, that did just that.

46.    **Clough's secret meetings with Vision.** On or about June 7, 2009, during a meeting in New York of Astrata's board of directors, Clough demanded the right to meet with Vision alone, and threw a fit when he was informed that such a meeting was neither authorized nor approved by Astrata's board.  On or about June 8, 2009, Clough nonetheless met with Vision by himself for at least one hour before the other Astrata board members attended the meeting, without the authorization or approval of Astrata's board.  On or about June 9, 2009, Clough once again met alone with Vision without the authorization or approval of Astrata's board.

47.    **Clough's implementation of Vision's unlawful takeover.**  Clough was a sophisticated advisor to General Atlantic, a $10+ billion hedge fund, and knew that Vision had to give 61-day prior written notice before its conversion of preferred stock to common stock would take effect. Clough nonetheless implemented Vision's unlawful takeover by remaining as the sole director, and sending notice of termination to the other directors.

48.    **Clough's admission that the takeover was unlawful.**  On August 7, 2009, Singapore-based Astrata director Martin Euler called Clough on his cell phone while Clough was traveling from Hong Kong, Special Administrative Region, China to mainland China, and with Clough's knowledge and assent put the call on speaker so that it was heard by Astrata's Chief Restructuring Officer, John Bryan, and Astrata Chairman, Tony Harrison.  Euler mentioned to Clough that Vision's takeover attempt was not legitimate and asked what should be done.  Clough acknowledged that the takeover was not legitimate and stated words to the effect "that's how we do it at General Atlantic.  We act as if we've taken over and fire everybody." Clough then chuckled and asked if Euler had gotten a hand-delivered letter yet.  At the time of the call, Euler had not yet received anything, but later that day he and Astrata Chairman Harrison received letters from Clough informing them that on behalf of the majority shareholder, Vision, they were to cease and desist from any further involvement in the business operations of Astrata's subsidiaries, access to the office premises, communication with the staff and customers, or access to any files or property belonging to Astrata or its subsidiaries.

49.    **Clough's disclosure of privileged communications.** On an unknown date, Clough transmitted to Vision confidential attorney-client communications between Astrata and its legal counsel, City Legal.  According to the testimony of Vision's representative in the October 9, 2009 hearing:

> "our primary source of information is the independent
> director….John Clough…And he sent – and the emails that
> I've seen indicate clearly that Anthony Harrison had direct
> negotiations with Fame's counsel.  And when Astrata's
> counsel, City Legal, instructed Mr. Harrison of the dangers of,
> you know, bypassing the company counsel and dealing
> directly with Fame counsel, Mr. Harrison basically told them
> not worry about it."

50.     Clough knew that he was violating his fiduciary duties by passing along privileged information.  On October 15, 2009, he wrote Littau an email stating:

"Please treat this confidentially as if it gets out obviously I

will be in legal trouble with AP [Astrata Pacific] and the

team…"

51.     **The conspiracy to steal the Tridex contracts.**  While Clough was outwardly working with Vision to unlawfully assume control of Astrata, he was also secretly plotting to take the Tridex contracts from Astrata, regardless of who controlled Astrata.

52.     **Clough's secret meetings with Tridex.**  Before and during the Chapter 11, while still a director of Astrata, Clough had secret and unauthorized meetings with Tridex to agree on the formation of a new management team comprised of Clough and Robin Littau, among others, that would either take over from the existing Astrata management, or in the event of Astrata's bankruptcy, form a new entity that would contract with the Tridex entities or their affiliates.

53.     Commencing in July 2009, Clough developed an independent relationship with Tridex without the knowledge, authorization or approval of Astrata's board.  According to testimony given at the October 9, 2009 hearing before this Court, Clough had face-to-face meetings with Tridex and had "a very good working relationship with the major customer."

54.     As a result of these unauthorized meetings, Tridex  ceased making its regular monthly payments to Astrata (the last payments of $100,000 per month were received on June 2 and July 2), and ceased all communications with Astrata Chairman Tony Harrison despite having entered into a side-letter agreement with him requiring him to move to Singapore for 3 years until the contracts were completed.

55.     **Clough's secret recruitment of Astrata employees.** Commencing in July 2009, Clough recruited Astrata Asia Pacific managing director Robin Littau, and former Chief Technology Officer Hoyt Layson, to his scheme.  Littau's phone records

for the month of July show that he had at least 82 phone calls/text messages with Clough, and 92 phone calls/text messages with Clough's friend and go-between, Peter Martin.  After July 2009, when Littau was confronted with such communications, they immediately ceased.

56.    **Clough's conspiracy with Littau to start a competing entity.**  Clough and Littau conspired and agreed that Astrata Pacific could not continue with the Tridex contracts.  On October 8, 2009, Littau wrote an email to Clough stating:

> "As you rightfully stated…..this is unbelievable. If AP
> remains in place everything will fail".

57.    Clough and Littau actively sought to recruit Tridex to their scheme.  On October 23, 2009, Clough sent Littau an email stating:

> "Working on the company Tridex - should achieve after we
> get the Transcript. I have left a hard copy with Chee Kiat last
> night".

A November 21, 2009 email from Clough to Littau states:

> "Time is of the essence as we need to move ahead and show
> we have a solid group to go forward with …Let me know if I
> can help but I really need your help when you meet with the
> TT executives to get this point across and try to get a response
> this weekend."

58.    **Destruction of evidence.**  Littau destroyed documents on his computer in or about August 2009, and improperly removed the hard drive from his Astrata Asia Pacific computer without authorization in or about September 2009.

59.    **Post-confirmation proof of the conspiracy.**  On February 5, 2010, after Astrata's bankruptcy plan of reorganization was approved by the Court, Tridex terminated its contracts with Astrata.  Shortly thereafter, Astrata hired a private investigator to conduct surveillance on Littau.  In March 2010, Littau was seen entering Tridex's office in Singapore. This was no coincidence.  On information and belief,

THIRD AMENDED COMPLAINT

Littau and Clough caused a new entity to be formed to take over the Tridex contracts for the Ultimate Customer.  On April 19, 2010, Littau received an email from a co-worker in his new business which stated:

"A little bit of status on what is happening in the Territory".

The "Territory" was the descriptor used for the Ultimate Customer in all of the Astrata contacts with Tridex.

60.    Plaintiff discovered that Missned Al Mohammed, a representative of the Ultimate Customer, met with Tridex and an offshore company specialist in Singapore. On information and belief, the purpose of the meeting was to set up an offshore structure to secretly share in and distribute part of the revenues and profits from the contracts to members of the ruling family who were also acting as government officials. On information and belief, Clough and Littau have also set up offshore structures for the same purpose.

## G.    Vision, Littau And Frost Aided & Abetted Clough's Breach

61.    **Vision's conspiracy with Clough.**  Vision conspired and aided and abetted Clough by entering into a secret agreement with him during meetings held in New York in June 2009 whereby he would remain the sole director, would terminate all of the other directors, would lead a new management team, and would vote to reverse the board approval of the Permanent Financing.  In furtherance of the conspiracy, Vision signed a shareholder's consent removing all of the directors except Clough, instructed him to terminate the other directors, instructed him to lead a new management team, and knowingly accepted and used Astrata's confidential attorney-client communications received from Clough.

62.    **Littau's conspiracy with Clough.**  In July 20009, Littau had numerous secret communications with Clough and his go-between Peter Martin, who was acting as Clough's proxy. In August 2009, Littau opened and destroyed computer files regarding Frost, Clough and Vision.  In August 2009, Littau disclosed attorney-client communications to Vision.  Specifically, he forwarded an August 11, 2009 email

regarding a missing share certificate to Clough or Vision, who forwarded the email to Vision's counsel Kaaren Thomas, who in turn sent an August 11, 2009 email to Astrata counsel regarding the missing share certificate.  In September 2009,  Littau refused to provide written assurances to Astrata regarding his lack of involvement with Frost, Clough and Vision and immediately resigned his position after being presented with a request for reassurances. In September 2009, Littau improperly removed the hard drive from his Astrata Asia Pacific computer without authorization.  Littau also conspired with Clough to steal the Tridex contracts, and then disclosed confidential, proprietary and trade secret information to Tridex after commencing doing business with Tridex.

63.    **Frost's conspiracy with Clough.**  Frost conspired, and aided and abetted Clough's breach, because Frost and Clough arranged for Littau's new entity to obtain funding from a company controlled by Frost's boyfriend, and the new entity commenced doing business with the Tridex entities after they had formally terminated the contracts with Astrata and its subsidiaries in or about February 2010. On information and belief, Frost and Clough have an interest in the success of Littau's entity either through a direct or indirect ownership interest or contractual relationship.

64.    **The releases of Clough and Frost.**  In late November 2009, as a condition of obtaining Frost's vote in favor of the Chapter 11 plan of reorganization, Astrata agreed to give releases to Frost and Clough.  At the time Astrata agreed to provide Frost and Clough with releases, Astrata was not aware that they had long since conspired and agreed to steal the contracts with the Tridex entities for themselves.  Had Astrata known the truth, it never would have agreed to provide them with releases since Astrata's plan of reorganization was designed around the fulfillment of the Tridex contracts.

## FIRST CLAIM FOR RELIEF
### (Intentional Interference With Prospective Economic Advantage)
### (By Plaintiff Against Vision)

65.    Plaintiff realleges paragraphs 1 through 64 of this Complaint.

THIRD AMENDED COMPLAINT

66.     Astrata and Fame had prospective economic relations arising out of or relating to the Permanent Financing as set forth in Paragraphs 30-35. At all relevant times, Vision knew of the existence of such prospective economic relations.

67.     Vision intended to interfere with the Permanent Financing as set forth in Paragraphs 36-38. Vision knew that it could not lawfully prevent the Permanent Financing before the August 14 deadline as set forth in Paragraph 39.

68.     Vision intentionally interfered with the Permanent as alleged in Paragraph 40.

69.     Vision's interference actually disrupted the Permanent Financing as alleged in Paragraph 41.

70.     Vision's interference caused Astrata to become insolvent and to file for Chapter 11.  As a direct result of the Chapter 11 filing, Astrata sustained damages that it would not have sustained if there had been no Chapter 11:

(a)     Approximately $1,500,000 in Chapter 11 administrative costs were incurred that would not have been incurred had the Permanent Financing been implemented before the Chapter 11.

(b)     The Chapter 11 filing caused the loss of key contracts entered into by Astrata and its subsidiaries and lost profits from those contracts.  Astrata was damaged because its shareholders and creditors would have been collectively 10% beneficiaries of those contracts and profits under the Permanent Financing had it been implemented.  Vision knew that these were foreseeable damages: on July 29, 2009, Vision informed Astrata in writing that "[w]e have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the Company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code."  As Vision predicted, on February 5, 2010, Tridex terminated its contracts with Astrata and its subsidiaries.  The lost profits from the Tridex contracts are estimated at $46,936,660, and lost profits on other lost contracts are estimated at $33,270,979.

THIRD AMENDED COMPLAINT

(c)   The Chapter 11 filing affected the enterprise value of Astrata by reducing its equity valuation to nothing.  The equity value would not have been destroyed if there had been no Chapter 11 filing.

(d)   The Chapter 11 filing caused a disruption of the normal business operations of Astrata and its subsidiaries, which suffered a consequent loss of cash flow.

71.   Vision's interference was willful and malicious, was motivated solely out of its own greed and desire to extract better terms from Fame, and was in conscious disregard for the rights of Astrata.  Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

## SECOND CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage)

### (By Plaintiff, As Assignee of Fame, Against Vision)

72.   Plaintiff realleges paragraphs 1 through 64 of this Complaint.

73.   Astrata and Fame had prospective economic relations arising out of or relating to the Permanent Financing as set forth in Paragraphs 30-35. At all relevant times, Vision knew of the existence of such prospective economic relations. Pursuant to the October 29, 2010 Assignment from Fame, Astrata has the right to assert Fame's claims against Vision for intentional interference with prospective economic advantage.

74.   Plaintiff hereby realleges and incorporates the allegations in the First Claim for Relief set forth in Paragraphs 65-71.

75.   As a result of Vision's unlawful assertion of control of Astrata's board in order to reverse the board's approval of the Short-Term Financing and Permanent Financing, Fame would no longer continue to invest in Astrata without a court-ordered plan, having already invested approximately $4 million that was in jeopardy of being entirely lost or tied up in litigation.

76.   Vision's interference caused Astrata to become insolvent and to file for

THIRD AMENDED COMPLAINT

Chapter 11.  As a direct result of the Chapter 11 filing, Fame sustained damages that it would not have sustained if there had been no Chapter 11:

(a)      Approximately $1,500,000 in Chapter 11 administrative costs were incurred that would not have been incurred had the Permanent Financing been implemented before the Chapter 11.

(b)      The Chapter 11 filing caused the loss of key contracts entered into by Astrata's subsidiaries and lost profits from those contracts.  Fame was damaged because it would have been a 90% beneficiary of those contracts and profits under the Permanent Financing had it been implemented.  Vision knew that these were foreseeable damages: on July 29, 2009, Vision informed Astrata in writing that "[w]e have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the Company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code."  As Vision predicted, on February 5, 2010, Tridex terminated its contracts with Astrata and its subsidiaries.  The lost profits from the Tridex contracts are estimated at $46,936,660, and lost profits on other lost contracts are estimated at $33,270,979.

(c)      The Chapter 11 filing affected the enterprise value of Astrata by reducing its equity valuation to nothing.  The equity value would not have been destroyed if there had been no Chapter 11 filing.

77.      Vision's interference was willful and malicious, was motivated solely out of its own greed and desire to extract better terms from Fame, and was in conscious disregard for the rights of Fame.  Plaintiff is therefore entitled to the imposition of punitive damages to punish the Defendants, set an example, and deter similar future conduct.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (By Plaintiff Against Clough, and against Vision, Littau, and Frost

### as Co-conspirators and/or Aiders and Abetters)

78.    Plaintiff realleges paragraphs 1 through 64 of this Complaint.

79.    As a director of Astrata from 2008 until January 10, 2010, Clough owed Astrata a fiduciary duty to act in the utmost good faith and in the best interests of Astrata.  Clough owed duties of care and loyalty which required him to avoid damaging Astrata and to preserve and protect the assets of Astrata, including but not limited to the value of its subsidiaries, its contracts and its trade secrets.  Any purported waiver or limitation of these duties is void as against public policy.

80.    Clough breached his fiduciary duty by participating in Vision's interference with the Permanent Financing, as evidenced by his expressed motive for breach, his secret meetings with Vision, his secret recruitment of Littau and other Astrata employees to the unlawful takeover effort, his implementation of the unlawful takeover attempt, and his disclosure of privileged communications to Vision, as set forth in Paragraphs 44-60.

81.    Vision conspired with Clough, and aided and abetted the breach alleged in Paragraph 72, by entering into a secret agreement with Clough during meetings held in New York in June 2009 whereby he would remain the sole director, would terminate all of the other directors, would lead a new management team, and would vote to reverse the board approval of the Permanent Financing.  In furtherance of the conspiracy, Vision signed a shareholder's consent removing all of the directors except Clough, instructed him to terminate the other directors, instructed him to lead a new management team, and knowingly accepted and used Astrata's confidential attorney-client communications received from Clough.

82.    Clough also breached his fiduciary duties by participating in the theft of the Tridex contracts while he was a director of Astrata, as set forth in Paragraphs 51-60.

83.    Littau conspired with Clough, and aided and abetted the breach, by holding numerous secret communications with Clough and his go-between Peter Martin, who was acting as Clough's proxy; destroying computer files regarding Frost, Clough and Vision;  disclosing attorney-client communications to Vision;  refusing to

provide written assurances to Astrata regarding his lack of involvement with Frost, Clough and Vision; improperly removing the hard drive from his Astrata Asia Pacific computer without authorization; forming a new entity which obtained funding in or about October 2009 from a company controlled by Frost's boyfriend, which new entity commenced doing business with the Tridex entities after they had formally terminated the contracts with Astrata and its subsidiaries in or about February 2010; and disclosing confidential, proprietary and trade secret information to the Tridex entities.

84.     On information and belief, Frost conspired with Clough, and aided and abetted the because Frost and Clough arranged for Littau's new entity to obtain funding from a company controlled by Frost's boyfriend, and the new entity commenced doing business with the Tridex entities after they had formally terminated the contracts with Astrata and its subsidiaries in or about February 2010. On information and belief, Frost and Clough have an interest in the success of Littau's entity either through a direct or indirect ownership interest or contractual relationship.

85.     Clough's breach of fiduciary duty caused Astrata to become insolvent and to file for Chapter 11.  As a direct result of the Chapter 11 filing, Astrata sustained damages that it would not have sustained if there had been no Chapter 11:

(a)     Approximately $1,500,000 in Chapter 11 administrative costs were incurred that would not have been incurred had the Permanent Financing been implemented before the Chapter 11.

(b)     The Chapter 11 filing caused the loss of key contracts entered into by Astrata's subsidiaries and lost profits from those contracts.  Astrata was damaged because its shareholders and creditors would have been collectively 10% beneficiaries of those contracts and profits under the Permanent Financing had it been implemented. Clough knew that these were foreseeable damages: on July 29, 2009, Vision informed Astrata's board, including Clough, that "[w]e have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the Company seek reorganization under Chapter 11 or protection under

THIRD AMENDED COMPLAINT

Chapter 7 of the Bankruptcy Code." As Vision predicted, on February 5, 2010, Tridex terminated its contracts with Astrata and its subsidiaries. The lost profits from the Tridex contracts are estimated at $46,936,660, and lost profits on other lost contracts are estimated at $33,270,979.

(c)    The Chapter 11 filing affected the enterprise value of Astrata by reducing its equity valuation to nothing. The equity value would not have been destroyed if there had been no Chapter 11 filing.

(d)    The Chapter 11 filing caused a disruption of the normal business operations of Astrata and its subsidiaries, which suffered a consequent loss of cash flow.

86.    Clough's breach was willful and malicious, was motivated solely out of his own greed, and was in conscious disregard for the rights of Astrata. Plaintiff is therefore entitled to the imposition of punitive damages to punish Clough, set an example, and deter similar future conduct.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets

### NRS 600A.050)

### (By Plaintiff Against Clough, Littau, and Frost)

87.    Plaintiff realleges paragraphs 1 through 64 of this Complaint.

88.    Astrata was the owner of legal and/or equitable title to the following trade secrets: (a) the identity of key customers; (b) confidential financial information; (c) key contract terms with customers; (d) the plans and specifications of customers; (e) the identities of key suppliers; and (e) proprietary technology and know-how.

89.    The trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use, and were the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

90. On information and belief, Clough and Littau misappropriated the trade secrets through: (a) the acquisition of the trade secret of another by a person by improper means; (b) the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; and (c) the disclosure or use of a trade secret of another without express or implied consent by a person who: (1) used improper means to acquire knowledge of the trade secret; and (2) at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; and (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

91. Plaintiff is informed and believes and thereon alleges that Clough and Littau used improper means to acquire the trade secrets, including, without limitation: (a) theft; (b) misrepresentation; and (c) willful breach and willful inducement of a breach of a duty to maintain secrecy.

92. Plaintiff is informed and believes and thereon alleges that Frost conspired with, and aided and abetted the misappropriation, by arranging for the funding of Littau's new entity that benefited from the misappropriation by entering into agreements with Tridex.

93. As a direct and proximate result of Defendants' actions, Astrata was damaged in the form of lost profits on the Tridex contracts estimated at $46,936,660.

94. Since the misappropriation was willful, wanton, reckless or in disregard of Plaintiff's rights, Plaintiff is entitled to exemplary damages under NRS 600A.050 (2).

95. Since the misappropriation was willful and malicious, Plaintiff is entitled to attorney's fees under NRS 600A.060 (3).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests judgment against the Defendants, as follows:

1.     For compensatory damages according to proof, plus prejudgment interest thereon at the legal rate;

2.     For disgorgement and restitution of all ill-gotten gains and unjust enrichment obtained by Defendants;

3.     For punitive and exemplary damages against all Defendants;

4.     For an injunction prohibiting Defendants from selling, distributing or servicing  Astrata's telematics product;

5.     For costs of suit incurred herein, including reasonable attorneys' fees;

6.     For pre-judgment interest; and

7.     For such other and further relief as the Court deems proper.

Date:  September 17, 2012          HARTMAN & HARTMAN

/s/  Jeffrey l. Hartman
_____
JEFFREY L. HARTMAN

AFFELD GRIVAKES ZUCKER LLP

/s/  Christopher Grivakes
_____
CHRISTOPHER GRIVAKES
Attorneys for plaintiff, JOHN BRYAN,
TRUSTEE, THE LITIGATION TRUST OF
ASTRATA GROUP, INC.

-25-
THIRD AMENDED COMPLAINT